[Crim. No. 19278. Oct. 25, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN EARL WALKER, Defendant and Appellant.

234

## Counsel

John Earl Walker, in pro. per., Norman W. de Carteret, under appointment by the Supreme Court, and Herbert F. Blanck, under appointment by the Court of Appeal, for Defendant and Appellant.

Sheldon Portman, Public Defender (Santa Clara), and Richard C. Neuhoff, Deputy Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders, Cynthia Sonns Waldman and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WRIGHT, C. J.**—The primary question at issue on this appeal is whether a defendant must *personally* use a firearm in the commission of a charged felony if he is to be subjected to the increased penalties

provided by Penal Code section 12022.5.[1] We answer that question in the affirmative but as defendant was sentenced to a life term by virtue of the conviction of the charged offense, such term cannot be increased because of his use of a firearm in the commission of the charged crime.

Defendant John Earl Walker and Cindy Lou Young were charged with murder (§ 187); only defendant is alleged to have used a firearm within the meaning of section 12022.5. A motion to sever was granted and on the day of defendant's trial, but prior to the selection of a jury, he unsuccessfully moved to substitute counsel. This appeal is from the judgment of conviction of first degree murder (§§ 189, 190) aggravated by the use of the firearm.

The record discloses that in the late evening David Wallace observed Frank Simpson, the victim herein, approach a young woman later identified as Cindy Lou Young. Simpson asked if he could buy her a drink; when she replied that she did not drink, he asked "What do you do?" Wallace did not hear her reply.

A half hour later Wallace saw the pair walk out of an alley and cross a street. Soon defendant emerged from the alley and crouched several times behind parked vehicles while he appeared to watch the couple walk arm in arm into and down another alley.

Wallace proceeded down the street and saw defendant meet with two other men in a parking lot near the alley which the victim had entered. All three men crouched behind a parked car. Shortly thereafter Wallace heard a loud noise which sounded like a gunshot in the parking lot,

[1]Section 12022.5 provides: "Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, assault with intent to commit murder, rape, burglary, or kidnapping, upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a period of not less than five years. Such additional period of imprisonment shall commence upon expiration or other termination of the sentence imposed for the crime of which he is convicted and shall not run concurrently with such sentence.

"Upon a second conviction under like circumstances, the additional period of imprisonment shall be for a period of not less than 10 years, and upon a third conviction under like circumstances the additional period of imprisonment shall be for a period of not less than 15 years, such terms of additional imprisonment to run consecutively.

"Upon a fourth or subsequent conviction under like circumstances, the defendant may be imprisoned for life or a period of not less than 25 years, in the discretion of the court.

"This section shall apply even in those cases where the use of a weapon is an element of the offense."

Hereinafter all statutory references are to sections of the Penal Code.

whereupon defendant and the other two men ran from the parking lot and crossed the street, passing within 12 feet of Wallace. He flagged down a patrol vehicle operated by Police Officer Trone and reported what he had observed, stating that defendant was wearing a red jacket and a red golf cap. Trone conducted an unsuccessful search for the suspects. Meanwhile, the victim approached another patrol vehicle and shouted that he had been "shot by three colored guys in the alley." He then lapsed into unconsciousness and expired as the result of a wound caused by a bullet which had entered his back from close range and penetrated his heart. No money, credit cards, or identification were found on his person although a witness testified that the victim had carried a large sum of money that evening.

Officer Van Coutren heard over the police radio that the three suspects were running in a northerly direction and drove his patrol car to the described area. He saw defendant, who was bareheaded and wearing a light colored shirt, run into an alley and drop an object. Defendant thereafter ran out of the alley and was walking on the street when stopped by Van Coutren. The officer noted that defendant was perspiring and had a rapid heartbeat. After taking defendant into custody the officer recovered a holstered .22 caliber revolver from the alley. Ballistics tests established that the gun was the murder weapon. No fingerprints were found on the revolver or on the holster.

Defendant testified in his own behalf and denied any involvement in the homicide. He offered an alibi that he had had a fight with Cindy Lou Young, with whom he lived, and was looking for her when police officers seized him. He denied owning any weapons, running through the alley, or disposing of the gun therein.

Defendant attacks his conviction on the ground that he was denied due process because he was not permitted to substitute counsel prior to trial. An experienced deputy public defender represented defendant at the preliminary examination and for four months prior to the trial. Defendant moved for the substitution on the ground that counsel had not consulted with him sufficiently to prepare properly for trial. He also complained that counsel had not moved for defendant's release on bail and had not conferred with defense witnesses.

The trial court heard defendant's reasons for the requested substitution and then asked defense counsel to respond. (See *People* v. *Marsden*

(1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Counsel conceded that he had not visited defendant at the jail because of his busy trial schedule. He indicated, however, that he had consulted with defendant on at least nine occasions in court and had twice taken as full and complete a statement as his client was prepared to give. He made no motion for release of defendant on bail because of the seriousness of the charges and the likelihood that if bail were set the minimum would be $100,000, the amount which had been set for Cindy Lou Young. The public defender's investigator had interviewed more than ten prospective defense witnesses even though defendant had provided only two names. Counsel stated his opinion that defendant's expression of dissatisfaction would not impair the effectiveness of his representation.

It is a matter of judicial discretion whether to substitute court-appointed counsel in the absence of a sufficient showing that a defendant's right to counsel would otherwise be substantially impaired. (*People* v. *Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513], and the cases there cited.) Defendant's initial refusal in the instant case to cooperate with appointed counsel by itself was not sufficient cause to require substitution of counsel (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 935-936 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984]), and there appears to be no abuse of the trial court's discretion or impairment of defendant's right to the assistance of effective counsel.

 Defendant attacks the finding that he used a firearm on grounds that the trial court improperly instructed the jury and that insufficient evidence existed to support such a finding. With respect to the allegation of use of a firearm, the jury was instructed in the language of CALJIC No. 17.19.[2] The jury commenced deliberations at 9:30 a.m. but returned to court at 2:35 p.m. on the same day for clarification of the word "used." The trial court's clarification was not reported. The jury retired to deliberate again at 2:40 p.m. and returned with the verdict at 3:30 p.m. on that day.

[2]The relevant portions of the instruction as given by the trial court read:
"It is charged that in the commission of murder the defendant used a firearm. . . .
"The term 'used a firearm' includes not only an intentional discharge thereof but also the use thereof as an object with which to hit or strike or display in a menacing manner.
"If you find the defendant guilty of murder, it then will be your duty to determine whether or not he used a firearm in the commission of the crime.
"He may be found to have used a firearm in the commission of the crime charged only if the proof shows beyond a reasonable doubt that he used a firearm at such time. . . ."

At the probation and sentencing hearing defense counsel moved to strike the use allegation. Denying the motion the court stated: "I want the record to reflect that following the defendant's conviction, both counsel and the Court had the opportunity to talk with the jurors, and I believe that we all agreed that the jury was not convinced beyond a reasonable doubt and to a moral certainty that the defendant himself had personally used the firearm in question, but that they returned such a finding based upon the Court's good-faith instruction to them that they could do so based on an aiding and abetting theory, and that instruction was given to them by the Court based in turn upon the case [*People* v. *Johnson* (1974) 38 Cal.App.3d 1 (112 Cal.Rptr. 834)] that was cited in either the comment or the use note citation that appeared at the bottom of [CALJIC No. 17.19]." Defense counsel remarked that the judge had reread "the instructions having to do with the fact that under the law, for the application of a 12022.5 allegation, it need not be proved that the defendant actually physically held the gun so long as the jury was satisfied that someone during the perpetration of the offense did in fact do so."

The note referred to by the trial court reads as follows: "A confederate who aids and abets in a robbery in which a victim was shot and killed by another principle, uses a gun within the meaning of Penal Code, § 12022.5. *People* v. *Johnson* [*supra*] 38 Cal.App.3d 1." But the confederate in *Johnson,* one Kelly, was himself armed with a revolver which he pointed at several of the robbery victims while Johnson fired the fatal shot from another weapon. Clearly *Johnson* does not support an instruction allowing a finding that a defendant is deemed to use personally a firearm which is in fact used by an accomplice in the perpetration of the charged crime.[3] It stands instead for the proposition

---

[3]The court in *Johnson* stated: "In applying weapon control laws other than section 12022.5 to multiparty crimes, the courts have been inclined to limit the penalty to the confederate who was personally armed. (See *People* v. *Hicks,* 4 Cal.3d 757, 766, fn. 4 [94 Cal.Rptr. 393, 484 P.2d 65]; *People* v. *Snyder,* 276 Cal.App.2d 520, 526-527 [80 Cal.Rptr. 822]; cf. *People* v. *Perryman,* 250 Cal.App.2d 813, 820-821 [58 Cal.Rptr. 921].) Here each defendant personally held a revolver. Although Kelly did not personally fire the shot which killed Nemie, he personally used a revolver in the series of joint offenses. Section 12022.5 penalizes those who *use* firearms in the *commission* of the listed crimes. A weapon is *used* within the meaning of section 12022.5 not only when it is fired, but when it is pointed at a victim to enforce a demand. (*People* v. *Chambers,* 7 Cal.3d 666, 672-673 [102 Cal.Rptr. 776, 498 P.2d 1024].) A person *commits* a crime when he aids and abets it. (Pen. Code, § 31.) Johnson and Kelly committed three joint crimes in the liquor store holdup, including the murder of Nemie. Even though Kelly did not personally shoot Nemie, he *used* a pistol in his *commission* of Nemie's murder. He is liable to the added penalty with reference to the murder of Nemie, even though he did not do the actual shooting." (*People* v. *Johnson, supra,* 38 Cal.App.3d 1, 12; original italics.)

that a weapon may be used in the perpetration of a crime even though it is not used to inflict physical injury.

The People, relying on *Johnson* and *People* v. *Bush* (1975) 50 Cal.App.3d 168 [123 Cal.Rptr. 576], contend that the finding that defendant in the instant case "used" a firearm was proper. As previously noted their reliance on *Johnson* is misplaced. *Bush* holds that an unarmed defendant "used" a firearm by taking the victims' wallets while his confederate held them at gunpoint. The jury instruction given by the trial court and which the appellate court held did not require reversal of a judgment of conviction was as follows: "[I]f 'a robbery is committed by two or more persons, and only one person uses a firearm in the commission of that robbery, all persons are responsible under Penal Code section 12022.5 for using a firearm in the commission of the robbery.' " (*Id.,* at p. 172.)[4] We disagree with the jury instruction and disapprove *Bush* for the reasons which follow.

The *Bush* court cited in justification of its reading of section 12022.5 our opinion in *People* v. *Chambers* (1972) 7 Cal.3d 666 [102 Cal.Rptr. 776, 498 P.2d 1024]. *Chambers* properly held that the word "uses" as employed in section 12022.5 should be construed broadly enough to encompass the act of pointing a firearm at a robbery victim and demanding money. (*Id.,* at p. 672.) But *Chambers* does not support the *Bush* rationale that section 12022.5 otherwise is to be so broadly construed as to reach defendants other than those who personally use a firearm. *Chambers* thus dealt with the issue of the particular *type of conduct* which constitutes "use." Presently, we deal with the question of *who is to be responsible* for that conduct, an issue for which *Chambers* is not an authority because it was not presented or considered in that case. The *Bush* court's reliance on *Chambers* for the proposition that section 12022.5 is intended to reach a broad category of persons is thus also misplaced.

As section 12022.5 does not expressly direct its application to particular persons or classes of persons we must otherwise determine the legislative intent. We are aided in this inquiry by other holdings in *Chambers* apart from its construction of the word "uses." The particular

---

[4]Although the *Bush* court declared that the instruction was erroneous because it allowed a jury to find that a defendant used a firearm even if he were unaware of its existence, the court nevertheless held that the error was harmless in the circumstances of that case because the unarmed defendant had knowingly used the *effect* of the firearm to steal the wallets. (*Id.,* at pp. 177-178.)

issue in that case was whether an accused who committed a robbery by use of a gun within the meaning of section 12022.5 could be subjected to the increased punishment provided by that section although the use of the gun was also the basis for elevating the robbery to one in the first degree. (*Id.,* at pp. 671-672.) In resolving that question in the affirmative we sought out the legislative intent in enacting section 12022.5. Of necessity, we examined first section 12022, which provides for an increased punishment for a person who had committed "any felony" while "armed" with a deadly weapon. In *People* v. *Floyd* (1969) 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862] we had held that the Legislature in enacting section 12022 had not intended to impose the increased penalty in those cases where being armed was a necessary element of the crime or of the degree of the crime found to have been committed, thereby limiting the punitive effect of an "armed" finding. Shortly thereafter the Legislature, "to overcome in part the problem upon which *Floyd* focused," enacted section 12022.5 to be applied " 'even in those cases where the use of a weapon is an element of the offense.' " (*People* v. *Chambers, supra,* 7 Cal.3d 666, 672.)

We concluded in *Chambers* that the Legislature, aware that under *Floyd* the punishment for a convicted felon armed with a deadly weapon could not be increased in certain cases, enacted new legislation intended to impose an increased punishment free of the *Floyd* limitation for "use" of a firearm in particular cases of aggravated conduct. (*Id.*; see also *People* v. *Strickland* (1974) 11 Cal.3d 946, 959 [114 Cal.Rptr. 632, 523 P.2d 672].) This rather circumscribed legislative intent suggests that the only substantive differences in the new provision are in the limited types of felonies to which that provision is applicable and in the definition of the proscribed conduct warranting the increased punishment. There is absolutely nothing which suggests a legislative intent to enlarge the applicability of the new provision to additional categories of persons. We have heretofore construed section 12022 and other sections enhancing criminal penalties for being armed (see §§ 1203, 3024) as limited in their application *only* to those persons convicted of felonies who were *personally armed* (*People* v. *Hicks, supra,* 4 Cal.3d 757, 765-766, fn. 4), and certainly we cannot now discern in the foregoing legislative history of section 12022.5 any intent to apply that section differently.

■ Generally, if a statute is intended to impose a derivative liability on some person other than the actor, there must be some legislative direction that it is to be applied to persons who do not themselves

commit the proscribed act. Such a direction is found in section 31 which fixes responsibility on an aider and abettor for a crime personally committed by a confederate. ■ But the statute which defines aiders and abettors as principals in the commission of a criminal offense does not also purport to impose additional derivative punishment grounded on an accomplice's personal conduct, as those statutes which provide for such increased punishment " 'do not define a crime or offense but relate to the penalty to be imposed under certain circumstances.' " (*People* v. *Strickland, supra,* 11 Cal.3d 946, 961 quoting from *People* v. *Provencher* (1973) 33 Cal.App.3d 546, 550 [108 Cal.Rptr. 792]; see also *People* v. *Henry* (1970) 14 Cal.App.3d 89, 92 [91 Cal.Rptr. 841].) Hence the rules which make an accused derivatively liable for a crime which he does not personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime.

■ As the armed allegation of section 12022 has always been applicable only to those persons personally armed, and as the only discernible legislative intent in enacting section 12022.5 was to eliminate the *Floyd* limitation of section 12022 in certain instances when a firearm was used, we cannot now infer a further legislative intent to make section 12022.5 applicable to a different category of persons than that to which section 12022 is applicable, that is, to those persons who personally commit the proscribed misconduct.[5]

■ Our conclusion, of course, is also compelled by the established policy "to construe a penal statute as favorably to the defendant as its language and the circumstances of its application reasonably permit; . . . the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute." (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

■ Had the jury been instructed solely in the language of CALJIC No. 17.19 it might have inferred from defendant's possession of the murder weapon shortly after the shooting that he had personally used the weapon. The verdict of guilty of murder did not independently resolve this question against defendant, however, since the murder verdict may be supported on an aiding and abetting theory. (Cf. *People*

[5]The language used in the opening paragraphs of each of the two code sections is substantially identical. Section 12022 begins as follows: "*Any person* who commits . . ." while section 12022.5 reads as follows: "*Any person* who uses . . . ." (Italics added.)

v.· *Mayberry* (1975) 15 Cal.3d 143, 157-158 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913].) Thus the error in the instruction, which advised the jury that it need not be proved that the defendant physically used the gun so long as the jury was satisfied that someone during the perpetration of the offense did use the weapon, was clearly prejudicial and normally would require a remand on the issue for retrial. (See *People* v. *Najera* (1972) 8 Cal.3d 504, 508-512 [105 Cal.Rptr. 345, 503 P.2d 1353].)

█ But a further issue requires .resolution. Defendant is already sentenced to life imprisonment and by the terms of section 12022.5 the "additional period of imprisonment shall commence upon expiration or *other termination of the sentence imposed for the crime of which he is* convicted and shall not run concurrently with such sentence." A term of life imprisonment expires or terminates only upon death or pardon, and not upon parole. (§ 3056.)

As previously noted section 12022.5 does not define a crime or offense; hence the term of imprisonment it provides does not merge or run concurrently with the life term as provided by section 669.[6] (*People* v. *Johnson, supra,* 38 Cal.App.3d 1, 11.) Defendant would thereby be sentenced to life imprisonment *plus* a consecutive term of five years to life, providing a prison sentence theoretically extending beyond death. While there is no bar to the imposition of such a sentence one could never serve it. (Cf. *In re McManus* (1954) 123 Cal.App.2d 395 [266 P.2d 929] [provisions of § 4530, requiring the punishment for escape to "commence from the time he would otherwise have been discharged from said prison," prevail over those of § 669].) The Legislature may have attempted to increase the time to be served before eligibility for parole (§ 3046) in the case of a defendant subject to a life term who also used a firearm, but the statute is not amenable to any such construction.

[6]Section 669 provides in part: "When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment shall direct whether the terms of imprisonment or any of them to which he is sentenced shall run concurrently, or whether the imprisonment to which he is or has been sentenced upon the second or other subsequent conviction shall commence at the termination of the first term of imprisonment to which he has been sentenced, or at the termination of the second or subsequent term of imprisonment to which he has been sentenced, as the case may be; provided, however, if the punishment for any of said crimes is expressly prescribed to be life imprisonment, whether with or without possibility of parole, then the terms of imprisonment on the other convictions, whether prior or subsequent, shall be merged and run concurrently with such life term. . . ."

Heeding again the dictates of *Keeler* v. *Superior Court, supra,* 2 Cal.3d 619, 631, "to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit," we conclude that a firearm-use finding pursuant to section 12022.5 can be given no effect in the case of a defendant sentenced to life imprisonment upon conviction of the basic crime in the perpetration of which he used the firearm.[7]

The judgment is modified by striking from the sentence the punishment imposed pursuant to section 12022.5 and as so modified is affirmed.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**RICHARDSON, J.**—I concur in that portion of the majority opinion which directs the modification of the judgment to reflect the fact that the additional term of imprisonment prescribed under Penal Code section 12022.5 may not be imposed to aggravate a life sentence.

I respectfully dissent, however, from the majority's principal holding that section 12022.5 applies only to one who *personally* uses a firearm in the commission of the felonies prescribed in that section. I am in complete disagreement with such a conclusion. In my view, the additional punishment under section 12022.5 may properly be imposed upon an offender whose criminal acts were aided and abetted by a firearm held or fired by an accomplice.

In this connection, I fully concur with the analysis and reasoning of Presiding Justice Kaus in *People* v. *Bush* (1975) 50 Cal.App.3d 168 [123 Cal.Rptr. 576], a recent case which the majority herein, unfortunately, disapprove. As expressed in *Bush,* ". . . a person can 'use' an article without personally handling it. Among the many definitions of the word 'use' in Webster's New International Dictionary (3d ed. 1966) we find: (1) 'to put into action or serve'; (2) 'have recourse to or enjoyment of'; (3) 'to carry out a purpose or action by means of'; (4) 'make instrumental to an end or process'; (5) 'apply to advantage' and (6) 'to benefit from the use of'. [¶] None of these meanings suggests that the person using the

---

[7]Clearly it is proper to plead a firearm-use allegation (§ 969d) and instruct the jury accordingly even if the underlying felony is one for which the minimum term is life (e.g., first degree murder or kidnaping for ransom (§ 209)) because the trier of fact might find the accused guilty of a lesser included offense (e.g., second degree murder or simple kidnaping (§ 207)), or a reviewing court might reduce the degree of the crime to one for which a life term is not prescribed, thus making the firearm-use finding applicable.

thing in question personally possesses, handles, or wields it. When two robbers enter a store and one holds the victims at bay with his gun while the other relieves them of their possessions, clearly the latter 'benefits from the use of' the former's weapon, has 'recourse' to it, carries 'out his purpose or action by means of' the gun and makes it 'instrumental to an end.' " (P. 177.)

The foregoing conclusion of Presiding Justice Kaus, is amply supported by common sense, by an analysis of the intent and state of mind of both actor and victim, and by the demonstrated public policy underlying section 12022.5.

In their interpretation of the statute the majority insist upon the addition of a new fourth word in the statute, causing it to read "any person who *personally* uses a firearm," etc. This change of language is adopted by the majority, notwithstanding the evident fact that several defendants during the course of a robbery may, in any meaningful sense of the term, "use" a single firearm.

Several considerations in combination point to such a conclusion. If we consider the state of mind of the multiple actors in Justice Kaus' cited example it cannot be doubted that *both* the robber who holds the handgun and the robber who seizes the victim's property are "using" the gun in question. The fact that the latter robber does not physically hold or touch the weapon detracts not one whit from the fact that he performs his criminal acts within, and because of, the protection of its lethal range. If we extend the analysis and view the situation through the eyes of the victims the same result ensues. Each victim yields to the will and conduct of the second robber because, and only because, the second robber "uses" the weapon held by the first robber, adopting derivatively its threatening force.

The search for the probable legislative intent behind section 12022.5 is not difficult, and the identical conclusion is reached. An unprecedented growth in crime characterized by an increase in the use of firearms caused the enactment of section 12022.5 in an attempt to restrain,

control, and deter the employment of dangerous weapons. We ourselves in *People* v. *Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024], recognized this very apparent purpose behind the statute which led us to our unanimous conclusion that "The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be *broadly construed.*" (Italics added.) This language seems very clear to me as an interpretive rule consistent with the broad public policy behind section 12022.5. The Legislature's commendable desire to deter firearm use requires that in interpreting the term "use" in section 12022.5, we construe it broadly. The majority decline to do so and, in effect, amend the statute.

The majority suggest that the only reason the Legislature enacted section 12022.5 was to avoid our holding in *People* v. *Floyd* (1969) 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862], to the effect that section 12022 (prescribing additional punishment for persons *armed* with a deadly weapon) was inapplicable to cases in which possession of a weapon was a necessary element of the offense committed. The majority assert that the Legislature did not also intend to change the prior rule that only those who are *personally armed* with a weapon may suffer the additional punishment prescribed by section 12022. (E.g., *People* v. *Hicks* (1971) 4 Cal.3d 757, 765-766, fn. 4 [94 Cal.Rptr. 393, 484 P.2d 65]; but see *People* v. *Perryman* (1967) 250 Cal.App.2d 813, 820-821 [58 Cal.Rptr. 921].)

If the Legislature's sole purpose in enacting section 12022.5 were to avoid the *Floyd* rule, it would have simply amended section 12022. Instead, the Legislature let that section stand and enacted an entirely new section prescribing additional punishment for a firearm "use." Although the word "armed" in section 12022 may indeed connote personal possession of a weapon (as an offender cannot be deemed "armed" with a weapon in another's possession), the term "use" is much broader and, as I have pointed out above, reasonably extends to one whose unlawful purposes are facilitated by a firearm physically possessed by an accomplice.

The record herein discloses that either defendant or his accomplice shot and killed Frank Simpson in the course of robbing him. The jury properly could infer that the use of the weapon facilitated the robbery

and that, accordingly, defendant "used" a firearm within the meaning of section 12022.5 whether or not he personally fired the weapon.

I think the majority err in their very narrow interpretation of the statute, notwithstanding the demonstrated policy behind it, in their rejection of *Bush,* and in their dilution of *Chambers.*

McComb, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied November 24, 1976. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.