[Crim. No. 29801. Second Dist., Div. Four. Aug. 1, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
CLEAOTIS WRIGHT, Defendant and Appellant.

**COUNSEL**

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Aurelio Munoz and Robert A. Schrage, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

JEFFERSON (Bernard), J.—By an amended information, defendant and Wilson Direll Dixon were charged in count I with having committed a robbery on March 19, 1976, in violation of Penal Code section 211. The victim of this robbery was alleged to be Marianna Rodriguez. It was also alleged in count I that in the commission of the offense, defendant and Dixon had each used a firearm within the meaning of Penal Code section 12022.5 and Penal Code section 1203.06, subdivision (a)(1). In count II it was charged that, on the same date, defendant and Dixon committed another robbery. (Pen. Code, § 211.) The victim in count II was stated to be Linda J. Barrett. Count II also contained a firearm-use allegation similar to that charged in count I. By an amendment to the information, it was alleged that defendant had previously sustained a conviction of the felony of violation of Penal Code section 496 (receiving stolen property).

Defendant pleaded not guilty and denied the use of a firearm allegation and the allegation that he had sustained a prior felony conviction. Defendant moved to relieve the public defender as his counsel of record and to represent himself. This motion was granted. Defendant's motion for the appointment of an investigator was also granted. On motion of the prosecution, the allegation that defendant had sustained a prior felony conviction was stricken.

Trial was by jury. A motion made by the prosecution pursuant to Penal Code section 1538.5, subdivision (j), was granted. The jury found defendant guilty as charged in each count and found each robbery to be first degree. The jury also found to be true the allegations that defendant had used a firearm within the meaning of Penal Code section 12022.5.

Defendant's motions for a new trial, to set aside the jury verdict, and for confinement pursuant to Penal Code section 1203.03 were denied. Probation was denied and defendant was sentenced to state prison for the term prescribed by law. The sentences on both counts were ordered to run concurrently with each other.

This appeal by defendant is from the judgment of conviction.

At about 10 p.m. on March 19, 1976, Miss Marianna Rodriguez was alone in her apartment at 500 East Washington Boulevard, apartment number 10, in Pasadena, watching television and talking on the telephone when she heard a knock on the door. Thinking it was a

neighbor, she said, "[c]ome in." The door was unlocked. Defendant then opened the door from the outside and started to step inside the apartment. Miss Rodriguez got up, went to the door and tried to prevent defendant from entering. Defendant pushed his way inside the apartment. He had a black pistol in his hand. Defendant pointed this gun at Miss Rodriguez' head and told her to give him her money and jewelry. Miss Rodriguez was the manager of the apartment complex where she lived. Defendant said he had information she had collected the rent that date. Miss Rodriguez first denied having any money and then directed defendant to her purse. Defendant took the few dollars that were in the purse; he then ordered Miss Rodriguez into the bedroom and told her to take off her clothes. He threw her on the bed and tied up her feet. As defendant was tying Miss Rodriguez, her neighbor entered the apartment and called for her. Defendant then fled from the apartment. After defendant left the apartment, Miss Rodriguez discovered that her son's Mickey Mouse watch was missing.

Later, the same evening, a man knocked at the door of Miss Linda Barrett's apartment at 686 Earlham Street in Pasadena. When Miss Barrett answered the door, the man broke the chain off the door, entered the apartment and forced Miss Barrett to the floor, holding a gun to her head. Another man then entered the apartment, went into the bedroom. After a few minutes he exited from the apartment. The first man picked up Miss Barrett's purse and also left the apartment. Miss Barrett's purse contained $10 or $15 as well as her wallet, keys and checkbook.

A few seconds before defendant left Miss Barrett's apartment, Miss Barrett's next door neighbor, Frank Branca, heard screams coming from her apartment. Mr. Branca told his girl friend, who was with him, to telephone the police. Mr. Branca then opened his door and looked over toward the Barrett apartment. He saw defendant exit Miss Barrett's apartment and walk downstairs. Defendant was holding in one hand what appeared to be an automatic handgun. Defendant proceeded to walk to a blue station wagon which was parked nearby in the street. Defendant entered the car from the driver's side. Another man was sitting in the passenger's side of the car. Defendant started the car and drove away. Mr. Branca testified that he related what he saw to his girl friend who was still on the telephone with the police and that she in turn described to the police the defendant, the car and the man in the passenger's seat of the car. When the car driven by defendant had gone about a block, Mr. Branca heard a helicopter in the area.

City of Pasadena Police Officer David Harris was on patrol in the Pasadena Police Department helicopter on the late evening of March 19, 1976, when he received a radio call to fly over the 600 block of Earlham Street. He was advised that an older model blue station wagon with a luggage rack on top was being driven by the suspect of a crime which had just occurred at 686 Earlham. From his helicopter Officer Harris saw a blue station wagon which matched the description he had been given. He started to follow the car and put out a radio call to police cars on the ground that he had spotted the suspect's vehicle. One of the police officers who picked up his radio call was Officer Marilyn Diaz.

After picking up the call from Officer Harris' helicopter, Officer Diaz, who was driving in a patrol car, observed the light blue Dodge station wagon described by Officer Harris. She followed the car and continued to get information about the car's movements over the radio from Officer Harris. The car eventually pulled into a driveway. At this time, Officer Diaz turned on the red lights on her vehicle and honked her horn to alert the occupants of the car. The car stopped and the two occupants exited and ran.

Officer Diaz got out of her patrol car and pursued the man who had been sitting in the passenger's seat of the station wagon. She eventually caught up with the man, codefendant Wilson Dixon, and arrested him. Dixon was wearing a wig, a pair of gold-rim sunglasses, and a pasted-on false beard. After arresting Dixon, Officer Diaz returned to the blue station wagon, entered it and seized a brown purse that was stuffed under the passenger's seat. Officer Diaz looked inside the purse and found identification objects in the name of Linda Barrett.

Police Officer Walter Ireland was on duty on the late evening of March 19, 1976, when he, too, went to the vicinity of Lincoln and Hammond Streets in Pasadena in response to the call from the Pasadena Police Department helicopter. After Officer Ireland arrived at this location, he and fellow officers arrested defendant whom they found hiding in some bushes. At the time he was arrested, defendant was not wearing a cap or a wig.

After the arrest of defendant, Officer Ireland contacted Officer Diaz, who was waiting by the blue station wagon. Officer Ireland entered the car and looked in the glove compartment, where he found receipts in defendant's name.

While Officer Ireland was investigating the blue station wagon, Jones, a security guard at the apartment complex where the station wagon had stopped, handed Officer Ireland a Mickey Mouse watch. Jones said he had found the watch a few minutes earlier about 15 feet from the station wagon.

After he finished investigating the station wagon, Officer Ireland went to the Pasadena City jail where defendant was being booked. During the booking process, Officer Ireland showed Officer Diaz the receipts he had found in the blue station wagon. As he was telling her where he had found the receipts, defendant, who was standing nearby, said, "[y]eah, those are my receipts. I'm a contractor."

The next day, March 20, 1976, Marilyn Gray found a wig, a man's cap, some sunglasses and a handgun in the back yard of her apartment. The Gray apartment was located on Hammond Street in Pasadena near the location at which defendant had been arrested the previous evening. Miss Gray took the items she found in her back yard, put them in a bag, and gave the bag with its contents to Officer Johnston. This officer checked the gun and determined that it was loaded with seven live rounds of ammunition.

Officer Hetherington interviewed defendant at the Pasadena police station on the afternoon of March 20, 1976. After having been advised of, and waiving, his *Miranda* constitutional rights, defendant stated that he owned the blue Dodge station wagon in question but he gave conflicting statements concerning his knowledge of the whereabouts of the vehicle and his activities prior to his arrest the evening before. Defendant was shown photographs of codefendant Dixon but denied knowing him.

Joseph Downs, a fingerprint expert, compared an exemplar of defendant's fingerprints with fingerprints which had been lifted from the blue Dodge station wagon in question shortly after defendant's arrest. On the basis of this comparison, Downs expressed an opinion that the fingerprints lifted from the car were made by defendant.

Codefendant Dixon, called as a witness by the prosecution,[1] testified that he first met defendant in late 1975; that on the evening of March 19, 1976, Dixon was standing around on a street corner when defendant drove up in his car, a blue Dodge station wagon, and spoke with Dixon.

[1]Before being called as a witness by the prosecution, Dixon had entered a plea of guilty to first degree burglary.

Defendant was wearing a cap, a wig, a pair of sunglasses and a false beard. Defendant drove Dixon to defendant's apartment. Defendant said he was going to check out a few things and he asked Dixon if he wanted to come along with him. Dixon agreed to go. Defendant then drove Dixon to Dixon's aunt's house so Dixon could get some different clothes. The two then drove back to defendant's house where Dixon changed clothes. Defendant provided Dixon with a wig and some pieces of a false beard. Dixon put on the wig and the pieces of false beard as well as some sunglasses that defendant provided.

Defendant and Dixon left defendant's house about 10 p.m. and drove in the blue station wagon to Washington Boulevard in Pasadena. There, defendant parked and exited from the car. Dixon remained in the car and saw defendant walk inside an apartment building. About five minutes later, defendant came back to the car and started driving again. Defendant said he was going to check out some girl. He then drove to another street and parked. He got out of the car and told Dixon to wait. Defendant then walked to the second story of a nearby apartment. From the car, Dixon heard defendant ask for Linda and a female voice replied in the affirmative. Dixon then heard the person to whom defendant was speaking scream. Dixon got out of the car, ran upstairs, entered the apartment and saw a girl on the floor. Defendant was on top of the girl and was holding a gun. Dixon said: "Oh, Lord! What's happening?" Dixon then ran downstairs. Defendant followed Dixon and they both entered the car and drove away. Dixon saw that defendant had a woman's purse with him.

As defendant was driving, a police car started following them. Defendant pulled into a driveway, stopped the car and told Dixon that he had better run because they would think he did it. Dixon got out of the car and ran. After he ran a little while, he decided to go back to the car because he felt he had not done anything wrong. He then started walking back towards the car and was placed under arrest by a woman police officer.

A day or two after March 19, 1976, Frank Branca went to the Pasadena police station where he identified a photograph of defendant as depicting the man he had seen leaving the apartment of his neighbor, Linda Barrett, on the night of March 19. Several days later, Marianna Rodriguez went to the Pasadena police station where she identified a photograph of defendant as being the man who had robbed her. At defendant's trial, Miss Rodriguez testified that she was positive defen-

dant was the man who robbed her. Branca testified he was positive that defendant was the man he saw leaving the Barrett apartment. At the trial, Marianna Rodriguez, Linda Barrett and Frank Branca each identified the gun, cap and wig which Marilyn Gray found in her back yard on the morning of March 20, 1976, as being the gun possessed by, and the cap and wig worn by, the robber on the night of March 19, 1976. Miss Rodriguez also identified the Mickey Mouse wrist watch found near defendant's station wagon at about the time defendant was apprehended as being the watch taken from her apartment when she was robbed. Miss Barrett also identified the purse removed from defendant's station wagon as being the purse taken from her the night of the robbery.

Defendant took the witness stand and testified in his own behalf. He stated that on the evening of March 19, 1976, he was walking home after visiting a friend when he saw police cars and a helicopter. Realizing that he had an outstanding traffic warrant, he attempted to avoid being stopped since he did not want to spend his upcoming birthday in jail. Defendant said that he owned the blue Dodge station wagon involved in the instant case, but that the last time he saw it was when he parked it at his ex-wife's house between 9:30 p.m. and 9:45 p.m. on March 19, 1976.

On this appeal, defendant asserts two errors as grounds for reversal of his judgment of conviction: *First,* the trial court erred in allowing defendant to substitute himself as his own attorney in place of the deputy public defender. Defendant claims that his trial counsel had failed to provide adequate and effective representation so that defendant was entitled, as a matter of constitutional right, to have substitute counsel appointed rather than proceeding in propria persona. *Second,* the trial court erred in admitting into evidence the purse and receipts taken from the station wagon because these items were obtained as a result of an illegal search and seizure.

I

### The Issue of Substitute Counsel
### Versus Self-Representation

Defendant advances the argument that he would have secured a better result below had he been represented by counsel. It is argued that inconsistencies in the prosecution's case could have been exploited to advantage by an able attorney, with the result of a substantial impairment of the credibility of the prosecution's witnesses. It is also urged that

able counsel for defendant would have succeeded in precluding the introduction into evidence of damaging evidence received against defendant, and that defendant may have been persuaded by a good attorney of the lack of wisdom in defendant's taking the stand and testifying.

The contention being advanced by defendant, through his appellate counsel, is that, if defendant shows, at the time he makes a motion to relieve his counsel and represent himself, that his counsel has inadequately and ineffectively represented him up to that time, the trial court has a duty and obligation to inquire of defendant whether defendant wouldn't prefer the appointment of substitute counsel rather than self-representation. It is appellate counsel's thesis that the trial court's failure to make adequate inquiry of defendant and a determination that trial counsel was inadequate and ineffective in his representation of defendant up to the point of defendant's request for self-representation renders the trial court's order permitting self-representation a violation of *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

This contention of defendant is lacking in substance. The authorities relied upon by defendant are distinguishable from the instant case. In *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], the defendant made a motion for substitution of counsel—not for self-representation in place of counsel as in the case at bench. The *Marsden* defendant first stated to the trial judge that he was not being adequately represented, and then said he would like to make a motion. Upon inquiry by the court as to what his motion was, he replied: "For proper counsel. I'm not adequate to give it myself and I don't feel I'm being adequately represented." (*Id.,* at p. 121.)

*Marsden* posed the issue as one involving a "decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial. . . ." (*Id.* at p. 123.) This decision to be made by the trial court was stated by *Marsden* to be one that was to be exercised within the discretion of the trial court. Such a discretion does not impinge upon the proposition set forth in *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733], that a criminal defendant is entitled, constitutionally, to the assistance of court-appointed counsel if such defendant is unable to employ private counsel.

In the instant case, defendant stresses the point made by *Marsden* "that the trial court cannot thoughtfully exercise its discretion in this matter without listening to his [the defendant's] reasons for requesting a change of attorneys." *(Marsden, supra,* 2 Cal.3d 118, 123.) Defendant contends here that it should be held to be a denial of fundamental fairness for a trial judge to take a criminal defendant at his *literal* word, relying on the statement from *Marsden* that "[t]he semantics employed by a lay person in asserting a constitutional right should not be given undue weight in determining the protection to be accorded that right." *(Id.* at p. 124.)

But *Marsden's* only holding is that when a defendant makes a motion to have *new counsel* substituted on the ground that his present counsel is providing him with inadequate representation, it is error for the trial court to deny his motion without giving him an opportunity to explain why he is receiving inadequate representation from his attorney.

*People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306], relied upon by defendant, is similar to *Marsden* in that the trial court refused defendant's request to substitute different counsel. But the trial court *listened* to the defendant's reasons and decided they did not constitute any showing that a continuance of the proceedings with the initial counsel would substantially impair his right to counsel. Defendant uses the *Walker* case to point out that, as distinguished from counsel's activities in the instant case, Walker's counsel had conferred with him on numerous occasions and had interviewed defense witnesses. But *Walker* is of little assistance in the case at bench since, in *Walker*, the trial court denied defendant's request for counsel substitution, while here, the trial court granted defendant's motion for self-representation. There is nothing in *Walker* to aid defendant's position that the trial court should have construed defendant's request for self-representation as a request for appointment of a new lawyer.

In *People* v. *Munoz* (1974) 41 Cal.App.3d 62 [115 Cal.Rptr. 726], the trial court permitted defendant to set forth the reasons he believed he was not getting too much help from his lawyer and why he desired new counsel. After hearing defendant's reasons, the trial court in *Munoz* denied defendant's request for a change in lawyers, but without first asking defense counsel to respond to defendant's charges of inadequate representation. The *Munoz* court held that it was error for the trial court to deny defendant's motion without making a careful inquiry into the defense attorney's position and ascertaining whether or not the attorney

was providing defendant with a competent defense. *Munoz* thus considered the trial court's action as "tantamount to a refusal on the part of the court to adjudicate a fundamental issue. . . ." (*Munoz, supra,* 41 Cal.App.3d 62, 66.) The failure of the trial judge in *Munoz* to make careful inquiry into the reasons advanced by defendant and in simply *listening* to the defendant's complaints made the trial court's ruling "lacking in all the attributes of a judicial determination." (*Spector* v. *Superior Court* (1961) 55 Cal.2d 839, 843 [13 Cal.Rptr. 189, 361 P.2d 909].)

But, in the instant case, the court accepted defendant's request for self-representation. The principles of *Marsden* and *Munoz* can have application only if the trial court rules against a defendant who claims inadequate representation by his attorney and seeks either a new lawyer or to represent himself.

In the case before us, the record demonstrates that defendant exercised his constitutional right of self-representation—a right enunciated by the United States Supreme Court in *Faretta*. The defendant knowingly and intelligently waived his right of counsel representation. The colloquy between trial judge and defendant establishes, without question, that defendant was warned of the danger and pitfalls he would likely encounter if he represented himself. To this warning by the trial judge, defendant replied that he was willing to risk his freedom on his own ability rather than on the ability of experienced counsel.

Having chosen the constitutional right of self-representation and, *not* having made any effort to change back to counsel representation as the trial proceedings progressed, defendant cannot be heard on appeal to assert that, in representing himself, he received ineffective or inadequate representation. A "[d]efendant's contention that he inadequately or ineffectively represented himself cannot be urged or sustained on appeal once he has elected to 'shoot craps' in the trial court and appear in propria persona." (*People* v. *Harris* (1977) 65 Cal.App.3d 978, 987-988 [135 Cal.Rptr. 668]; see also *People* v. *Owens* (1977) 66 Cal.App.3d 720 [136 Cal.Rptr. 215] (defendant representing himself calls as a witness an accomplice who gives damaging testimony against defendant).) At no point in the colloquy between the trial judge and defendant did defendant suggest or intimate that he desired new counsel in place of defense counsel then representing him.

Since we find no error in the trial court's ruling permitting defendant to represent himself, we do not reach defendant's contention that such an error constitutes reversible error per se (see *In re Smiley* (1967) 66 Cal.2d .606 [58 Cal.Rptr. 579, 427 P.2d 179]) or that the error is not harmless beyond a reasonable doubt under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

## II

*The Issue of the Legality of the Warrant-*
*less Search of Defendant's Vehicle and the*
*Admissibility of the Items Found Therein*
*and Seized*

Pursuant to Penal Code section 1538.5, subdivision (j),[2] the trial court conducted a hearing to relitigate the question of the validity of the warrantless search of defendant's station wagon and the seizure therefrom of the purse belonging to Linda Barrett and the two receipts in the name of defendant. Defendant contends that the trial court erred in granting the prosecution's motion and admitting in evidence the purse and two receipts.

The evidence presented at the hearing on the prosecution's motion consisted solely of testimony from Officer Diaz, who had previously testified before the jury prior to the hearing on the prosecution's motion under Penal Code section 1538.5, subdivision (j), and of testimony from Officer Ireland. Essentially, the testimony of Officers Diaz and Ireland was to the effect that each had received radio calls from the police desk sergeant advising first, that a person had been shot at 686 Earlham in Pasadena; next came a description from the police helicopter describing the suspect vehicle and its location. Subsequently, a radio call from the police desk sergeant changed the suspected crime to that of armed robbery. Officer Diaz followed the blue station wagon and, when it stopped, saw two persons exit from the vehicle. Officer Ireland arrived at the location where the station wagon was parked and was told by Officer Diaz that the two suspects had fled.

After catching and arresting Dixon, Officer Diaz came back to the station wagon, entered it, and found the brown purse that belonged to

___

[2]Penal Code section 1538.5, subdivision (j), provides, inter alia, that "the validity of the search or seizure shall be relitigated de novo on the basis of the evidence presented at the special hearing."

Linda Barrett stuffed underneath the front seat—an area which was obviously not in plain sight. Officer Ireland searched the glove compartment and located the two receipts in defendant's name. Officer Ireland testified that at the time of his search, he considered that he had impounded the car and was looking for the registration and any other evidence relating to the crimes under investigation.

█ The issue here involved is whether, at the hearing conducted pursuant to Penal Code section 1538.5, subdivision (j), the prosecution proved, by a preponderance of the evidence, that the warrantless search of the station wagon vehicle was justified so as to permit the introduction into evidence of the seized items—the purse and receipts. (*People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135] (voluntary consent as warrantless search justification).)

The major thrust of defendant's contention is that the prosecution presented no evidence with respect to the reliability of the information received by Officers Diaz and Ireland from the police sergeant's radio calls that the suspects in the station wagon had committed armed robbery. █ The Attorney General argues that we should summarily reject this contention because it was not made in the trial court and, hence, cannot now be raised on appeal. However, this is not a valid answer to defendant's contention. Defendant filed with the trial court a written declaration in support of a motion to dismiss the information pursuant to Penal Code section 995. In this declaration defendant clearly challenged the legality of the search on the ground now urged before us. Defendant's declaration satisfies the requirement established by Evidence Code section 353, subdivision (a), that, in order for a party to attack a judgment by reason of the erroneous admission of evidence, "[t]here *appears of record* an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." Here, defendant's written declaration was filed with the trial court prior to the hearing of the prosecution's motion pursuant to Penal Code section 1538.5, subdivision (j). The record thus reflects an objection to the admissibility of the questioned items of evidence, timely made, and stated in such a way as to "make clear the specific ground of the objection"—a ground clearly urged below and now urged on this appeal.

The instant case is not unlike that presented in *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202] in which a police officer arrested a suspect for murder based upon information supplied by the

police department, requesting that the suspect be taken into custody. The *Lara* court explained that the arresting police officer "was entitled to make an arrest on the basis of this information, as it was received through official channels. [Citation.] Of course, as there was no outstanding warrant for [the suspect's] arrest the prosecution was also required to show [citation] that the *officer* who *initiated* the request had reasonable cause *himself* to believe that [the suspect] had committed a felony." (*Lara, supra,* 67 Cal.2d 365, 374. Italics added.)

In the case at bench, the prosecution did *not* produce evidence that the police desk sergeant who broadcast to Officers Diaz and Ireland that a shooting, and then a correction to an armed robbery, had taken place and describing the suspect's vehicle, had reasonable cause *himself* to believe that the occupants of the blue station wagon had committed a felony, to wit, robbery. As stated in *Remers v. Superior Court* (1970) 2 Cal.3d 659, 666 [87 Cal.Rptr. 202, 470 P.2d 11], "[i]t is well settled that while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying the total police activity in court, the People must prove that the source of the information is something other than the imagination of an officer who does *not become a witness.*' " (Italics added.) "To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information, without establishing under oath how the information had in fact been obtained by the former officer." (*People v. Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971].)

The views of *Lara, Remers* and *Madden* are supported by the express provisions of Penal Code section 1538.5. Thus, subdivision (c) provides that "[w]henever a search or seizure motion is made in the municipal, justice or superior court as provided in this section, the judge or magistrate shall receive evidence on any issue of fact *necessary* to determine the motion." (Italics added.) Under *Lara, Remers* and *Madden,* testimony from the police officer who initiated the request for an arrest of a suspect constitutes evidence "necessary to determine the motion" (Pen. Code, § 1538.5, subd. (c)) since such testimony is required to show that the *initiating* officer "had reasonable cause himself to believe that [the suspect] had committed a felony." (*Lara, supra,* 67 Cal.2d 365, 374.)

■ Thus, in the instant case, at the hearing to determine the validity of a warrantless search of the blue station wagon, the record fails to show that there was any probable cause to arrest codefendant Dixon or defendant, or to search the station wagon. The Attorney General advances the argument that there was probable cause for the police to believe that the car, including its glove compartment, contained evidence or contraband relating to the robbery of victim Linda Barrett and, as an additional ground, that the glove compartment may have contained the vehicle registration necessary to identify the abandoned vehicle's owner. This alleged justification for the search is unfounded and not supported by any evidence in the record.

The Attorney General, apparently, considers that the at-trial testimony of the victim, Linda Barrett, with respect to the robbery, and of Frank Branca to the effect that he saw defendant leave the Barrett apartment with a gun and that Branca had his girl friend call the police, constitutes reasonable cause for the actions of Officers Diaz and Ireland. But this view overlooks the fact that Penal Code section 1538.5, subdivision (j), specifically provides that the validity of a search or seizure shall be relitigated de novo at a special hearing for such purpose "on the basis of the *evidence presented at the special hearing*." (Italics added.)

■ Under the plain and explicit language of section 1538.5, subdivision (j), the trial court may look only to the evidence introduced at the special hearing in determining the validity of the search. The trial court may *not* consider evidence introduced subsequently at defendant's trial but *not* introduced at the special hearing. The same principles apply to a suppression-of-evidence hearing conducted in the superior court on a defendant's motion, made pursuant to Penal Code section 1538.5, subdivision (i). Subdivision (i) provides that "[t]he defendant shall have the right to litigate the validity of a search or seizure de novo on the basis of the evidence presented at the special hearing."

In the instant case, the only evidence presented at the special hearing conducted pursuant to section 1538.5, subdivision (j), was the testimony of Officers Diaz and Ireland. The principles of law enunciated in *Lara, Madden* and *Remers,* therefore, must be applied solely to the evidence presented at the special hearing. Under *Lara, Madden* and *Remers,* this evidence is clearly insufficient to justify the search of defendant's blue station wagon and the seizure of the Barrett purse discovered under the front seat and of the two receipts found in the glove compartment.

█ Nor can the warrantless search of the automobile be justified on any urgency or impound theory. Here, at the time of the search of the glove compartment, one occupant—Dixon—was under arrest and handcuffed outside of the vehicle. The other occupant—defendant—had disappeared and the search for him was under way. Several police officers were present. Under such circumstances, "there was no reason to suspect that the car would not remain safely in police custody until it was impounded and removed to the police garage, and warrant obtained." (*People* v. *Jochen* (1975) 46 Cal.App.3d 243, 248 [119 Cal.Rptr. 914].)

█ We hold, therefore, that it was error for the trial court to admit in evidence the purse of the victim, Linda Barrett, and the receipts bearing defendant's name, since these items of evidence were secured as a result of an illegal warrantless search. █ The remaining question is whether the error was prejudicial. The evidence of defendant's guilt of the two robberies was substantial. There was positive identification testimony of defendant given by Marianna Rodriguez, the victim of the robbery charged in count I. With respect to the Barrett robbery charged in count II, although the victim, Linda Barrett, could not identify defendant as the perpetrator, the testimony of Frank Branca, the next door neighbor of Linda Barrett, and that of defendant's accomplice, Wilson Dixon, identified defendant as the perpetrator of the Barrett robbery. The evidence against defendant was certainly substantial apart from the illegally seized purse and receipts. Thus, the error in admitting these items of evidence was nonprejudicial beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)

The judgment from which the appeal has been taken is affirmed.

Kingsley, Acting P. J., and Dunn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 28, 1977.