Filed 5/12/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049326 |
| v. | (Super. Ct. No. SWF10001774) |
| ROBERT CONRAD ACOSTA et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Riverside County, Mark Mandio, Judge.  Affirmed as modified and remanded with directions.

Rex Williams, under appointment by the Court of Appeal, for Defendant and Appellant Robert Conrad Acosta.

Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant Monique Evette Acosta.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

Under Penal Code section 502.5, a borrower under a loan secured by real estate may not intentionally harm the lender by removing statutorily specified improvements from the encumbered premises.[1] Section 502.5 was amended to read in its present form some 91 years ago. Despite the age of the statute, we have not found a single appellate opinion, published or unpublished, in which an appellate court has reviewed a conviction under the statute. It appears we have been tasked with being the first to do so.

A jury convicted defendants Robert Conrad Acosta and Monique Evette Acosta of violating section 502.5 by taking improvements or fixtures from their foreclosed home.[2] The jury found true the allegation that defendants took or damaged property causing a loss of over $65,000, for purposes of a "great taking" enhancement. (§ 12022.6, subdivision (a)). The court placed them on probation for five years on condition they serve jail time of 270 days.

On appeal defendants argue section 502.5 is unconstitutionally vague and that the court improperly instructed the jury on the definition of the word "fixture." Monique further contends the court erred by instructing the jury that the great taking enhancement encompasses vicarious liability. Finally, defendants contend that payment of probation supervision costs should not have been made a condition of probation.

We agree the court should have ordered defendants to pay probation costs as a separate order, rather than as a condition of probation. In all other respects, we affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] For convenience and to avoid confusion, we refer to defendants singularly by their first names. We intend no disrespect.

FACTS

In May 2007, defendants borrowed about $700,000 from San Diego Metropolitan Credit Union (the lender) by refinancing the mortgage loan on their home. The lender had the home appraised before approving the loan. The appraiser found the house was "a customized home in a tract area." It was "exceptional" and had many upgrades. The exterior upgrades included stone work, a wood gate, a courtyard, a patio, a fireplace, a swimming pool with a waterfall and a spa, and an exterior shower. Inside the house, the kitchen cabinets, countertops, backsplash, and appliances were upgraded, as was the staircase banister, the carpet, and a custom wet bar with wine racks. The appraiser factored in the upgrades in estimating that the home's value was $705,000.

The lender relied on this appraisal in determining the amount of the loan it made to defendants. The deed of trust listed "fixtures to the home" as part of the security collateral. The deed of trust specified that, "fixtures now or hereafter a part of the property" were part of the secured property. Tina Medrud, who managed foreclosed properties for the lender, explained at trial that a fixture is anything affixed to the property, whether it is screwed in, bolted in, drilled in, hardwired, stapled or glued to the walls.

Defendants rented the home to Patrick Dunham and his family from December 1, 2008 to January 15, 2010. When the Dunhams moved out, they left the home in "pristine" condition. They moved out because Robert asked them to vacate the house so that Robert could try to refinance the home as owner occupied.

On June 8, 2010,[3] Medrud told Robert, who was living in the house, that he could stay there until June 30, even though a June 14 foreclosure sale was scheduled for the house. Medrud agreed not to start eviction proceedings, so long as the property was given to her in good condition on July 1.

Monique e-mailed Medrud on June 9. Monique said they would not leave the house in good condition unless the lender gave them $10,000 in return for the keys. Monique wrote, "$10,000 plus will maybe get me and my aunt to move out of this home in good condition," with multiple exclamation points.

From early June through June 14, when defendants moved out, they seriously damaged the property. Monique cut down a tree in the back yard and pushed it into the swimming pool. Both defendants pulled up plants in the back yard. Inside the house, there was spray paint on the walls. Monique put black dye on the master bathroom grout. In order to bring a heavy bar down from the upstairs game room, Robert and a neighbor used a sledgehammer to pull out wrought iron posts from the staircase. While defendants were at home, someone used the sledgehammer to tear apart or demolish a whirlpool hot tub in the back yard. Stonework between the swimming pool and the whirlpool hot tub was damaged and removed. In the kitchen, the cabinet doors, drawers, countertops, and appliances were removed. Wooden beams attached to the ceiling of the entryway were removed. Half of the rock facing on the house was gone and the rocks were lying on the ground. The garage door and the entry gate were gone. Defendants moved things out of the house into storage pods. A big semi-truck also moved things away from the house.

---

[3] All dates refer to the year 2010 unless otherwise stated.

After 5:00 p.m. on June 14, Monique e-mailed Medrud that defendants had vacated the property. A neighbor checked the door from the garage into the house, the main front door, and two French doors going into the house, and determined that all those doors were locked.

The house did not sell to a third party at the foreclosure sale, and the lender thus acquired the property.

The next day Medrud went to the property and saw "total destruction." The exterior façade was torn off, with bricks lying on the ground. The gate and light fixtures were missing. Inside, every appliance was removed; every plumbing pipe was broken; every outlet was smashed in. All the countertops were missing. The pool was destroyed; the pool equipment was destroyed; the pool pumps were cut; the air conditioning units were missing. Black paint was on all the tiles. Plants and stuff were thrown in the pool and the pool steps were chipped.

Medrud contacted law enforcement. A responding officer filmed the interior of the home and found spray cans inside trash bags in the kitchen and the garage. While officers were visible in front of the house, Medrud received a phone call from Robert; she did not answer it.

That same day, Bryan Sheets, a licensed contractor, surveyed the property. At trial, he explained how the missing items, such as carpet, shutters, appliances, countertops, doors (including 12 interior doors), outlets, and air conditioning units, had been affixed to the realty. He estimated it would cost $166,000 to restore the house to a sellable condition.

Medrud telephoned Robert later that afternoon from the police station. A recording of the call was played for the jury. Robert said he had called to find out why police officers were at the property. Medrud asked what condition the house was in when defendants left the property. Robert said it was in "fair condition" and he was fixing extensive damage caused by his tenants. Robert feigned surprise when Medrud said the

5

house had been spray painted and the banister had been torn up. He said he had left the large bar upstairs rather than to risk taking it down. Robert finally said he "was under the impression" that he could take the items for which he had receipts. Medrud told him if he took a kitchen counter, he had to replace it with another counter. Robert said he understood that. Robert denied cutting wires, smashing outlets, destroying the outdoor fireplace and the front brick work, and spray painting walls. When Medrud mentioned the threatening e-mail from Monique, Monique (who was also on the line) blamed their tenants.

An officer located the storage units, which contained cabinet doors, drawers, appliances, shutters, lighting fixtures, gates, decorative ceiling beams, ceiling fixtures, a small granite countertop, and tiles. Some missing fixtures were *not* recovered from the storage unit, such as the garage door, courtyard pavers, banister, kitchen countertops, carpet, doors, and air conditioning units. The officer found two ads on the Craigslist.org Internet Web site, dated May 27, 2010, advertising cypress trees and two air conditioning units for sale, with Robert's telephone number.

Defendants each have a California real estate license, which requires a person to take classes and pass a test, including information about mortgages and fixtures.

A detective interviewed Robert, with his attorney present, on June 29. A recording of the interview was played for the jury. Robert stated that when he moved back into the home in January, his tenants had left the yard and pool unkempt and the interior of the house and the appliances filthy, and had left holes in the walls where they had anchored fixtures. Robert also said that the tenants' dogs had soiled and scratched the carpet, staircase, and wood floor. When asked the condition of the house when he (Robert) moved out, Robert said there were "scratches and . . . stuff on the walls," but no vandalism. Rock facing on the front of the house was intact. The kitchen was "fine" and intact, with cabinets, countertops, drawers, and the sink all in place. Robert admitted he

6

took items he had purchased, including the exterior light fixtures, garage door, gates, decorative beams, carpet, shutters, speaker system, stove hood, three chandeliers, and speakers.

Ultimately, the lender did not make any repairs but sold the property in late November 2010 "as is" to a third party for $178,500. The lender received $144,000 from its insurer.

Robert testified in his own defense. He described the extensive upgrades that defendants purchased and installed in the house and the yards. Robert admitted that when he moved out, he took the items for which he had paid, because he believed they were his property.

DISCUSSION

*Section 502.5 is Not Unconstitutionally Vague*

Defendants contend that section 502.5 is unconstitutionally vague on its face, arguing that "the terminology it employs is so confusing and lacking in definition that a person of ordinary intelligence necessarily must guess as to its meaning." We disagree with that assessment.

A statute is not unconstitutionally vague if the "accused can reasonably be held to understand by the terms of the statute that his conduct is prohibited." (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 493.) "A statute must be definite enough to provide a standard of conduct for its citizens and guidance for the police to avoid arbitrary and discriminatory enforcement." (*People v. Townsend* (1998) 62 Cal.App.4th 1390, 1400.) A "'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application'" violates the due process requirement of adequate notice. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115.) But a "statute is not vague if . . . any

7

reasonable and practical construction can be given to its language. Reasonable certainty is all that is required." (*Townsend*, at p. 1401.) There is a "'strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears."'" (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 568.)

At issue here is section 502.5, which forbids a borrower from intentionally harming a lender by removing or disposing of certain specified items from the encumbered premises: "Every person who, after mortgaging or encumbering by deed of trust any real property, and during the existence of such mortgage or deed of trust, . . . and with intent to defraud or injure the mortgagee or the beneficiary or trustee, under such deed of trust, . . . takes, removes or carries away from such mortgaged or encumbered premises, or otherwise disposes of or permits the taking, removal or carrying away or otherwise disposing of any house, barn, windmill, water tank, pump, engine or other part of the freehold that is attached or affixed to such premises as an improvement thereon, without the written consent of the mortgagee or beneficiary, under deed of trust, . . . is guilty of larceny and shall be punished accordingly." (*Ibid.*)

Defendants challenge as unconstitutionally vague the phrase, "other part of the freehold that is attached or affixed to such premises as an improvement thereon" (the challenged phrase).[4] Defendants complain section 502.5 does not define each of the subparts used in the challenged phrase: "part of the freehold," "attached or affixed," "premises," or "improvement."

---

[4] Defendants demurred to the complaint on this basis. The court overruled the demurrer, explaining that, although the statute is old and the term "freehold" is archaic, the term is well-defined in the law, as is the concept of what items are affixed to the property. The court stated that, although it may not be clear whether certain items are fixtures, this does not render the statute vague or unconstitutional, but rather results in factual questions for the trier of fact.

We reject defendants' contention. A person of common intelligence can understand the statute, including the challenged phrase. Average people can understand the concept of an "improvement" to property, the condition of being "attached or affixed," and that "premises" refer to the encumbered property.

Defendants focus on the term "affixed." They argue that the expressly enumerated items in the statute — i.e., "any house, barn, windmill, water tank, pump, [or] engine" (§ 502.5) — appear, in Robert's words, "to constitute structures or equipment attached to the land itself," but the statute does not refer to Civil Code section 660's definition of "fixtures" or otherwise define fixtures, and thus, except for the specifically enumerated items such as a "water tank" or "pump," use of the word "affixed" in the statute is vague. But one does not need a legal education, or a reference to Civil Code section 660 for that matter, to understand the common meaning of the word "affixed." The word "affix" is commonly defined as "to attach physically" or "to attach in any way." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 20.)

As to the term "freehold," although it is archaic, when considered in context and in a layman's terms, a person of common intelligence can understand that section 502.5 forbids a borrower from intentionally harming a lender by removing or disposing of items attached or affixed as improvements to the encumbered property, and which are part of the borrower's legal holding or to which the borrower holds title.

Defendants also contend that the phrase "attached or affixed" is vague with respect to the time of attachment. This contention lacks merit. The statute makes clear that the issue is whether the item is attached or affixed to the encumbered property at the time the defendant takes, removes, or disposes of it.

Section 502.5 is not unconstitutionally vague on its face.

9

*Jury Instructions*

Defendants contend the court improperly instructed the jury on the term "fixture" and on the great taking enhancement.

A trial court bears a sua sponte duty to instruct the jury on "'"'the general principles of law relevant to the issues raised by the evidence"'"' (*People v. Breverman* (1998) 19 Cal.4th 142, 154), including the elements of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 479-480). "The prosecution has the burden of proving beyond a reasonable doubt each element of the charged offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1208.) "An instructional error relieving the prosecution of its burden violates the defendant's rights under both the United States and California Constitutions." (*Ibid.*) "'Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'"'" (*People v. Mills* (2012) 55 Cal.4th 663, 677.)

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574.) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Taking into account the instructions as a whole and the trial record, we "determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

### 1. *The Court Properly Defined "Fixture" for the Jury*

To assist the jury in deciding whether defendants violated section 502.5, the court instructed them with a definition of the term "fixture." Defendants contend the instruction was erroneous.

At a pretrial hearing, the court considered defendants' motion to exclude photographs of property damage unrelated to the removal of fixtures. In that connection, the court asked the parties to offer their definitions of a "fixture." Monique's counsel cited *People v. Lee* (1994) 24 Cal.App.4th 1773 (*Lee*). The People cited Civil Code section 660.

Subsequently, during recross-examination and redirect examination of Medrud, she was asked, at length, whether various items were fixtures. The court properly interceded, telling the jurors it would read them the Civil Code definition of a fixture and that, ultimately, the jurors would have to decide which items were fixtures. The court then read the jury the Civil Code section 660 definition of a fixture, as follows: "A thing is deemed affixed to land when it is attached to it by roots, as in the case of trees, vines or shrubs; when it is embedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws."

Defendants later asked the court to instruct the jury with a definition of "fixture" from *M.P. Moller, Inc. v. Wilson* (1936) 8 Cal.2d 31, 38 (*Moller*). In *Moller*, our Supreme Court affirmed the trial court's finding that a pipe organ installed in a house was not a fixture. (*Id.* at pp. 33-34, 39.) *Moller* stated that "whether an article is or was physically affixed to the building is only one of the criteria in determining whether there was an intention to make it a permanent accession to the real property." (*Id.* at pp. 37-38.) Another "indication of an intent to make the article a permanent fixture and part of the realty" is whether it appears "from the nature of the chattel that if used for the purpose for which it was designed it would naturally and necessarily be annexed to and

11

become a permanent and integral part of some realty; in other words, that it would become essential to the ordinary and convenient use of the property to which it was annexed." (*Id.* at p. 38.)

The court denied defendants' motion. The court explained that *Lee*, the case which Monique's counsel had previously cited for its quotation of the *Moller* definition of "fixture," was an arson case in which the issue was whether wall-to-wall carpeting was a fixture. (*Lee*, *supra*, 24 Cal.App.4th at p. 1777 [*Moller* "devised a test to determine whether a certain item of personal property is a fixture"].) The court further explained (1) that *Lee* did not quote the *Moller* test as required language for a jury instruction and did not suggest that the Civil Code section 660 definition is not a good jury instruction for fixtures other than carpeting, and (2) that the test's language, "'integral part of some realty'" and "'essential to the ordinary and convenient use of the property'" (*Lee*, at p. 1777), is in fact misleading "without explanation or context, such as given in Civil Code section 660," and without informing the jury that the language concerned "wall-to-wall carpeting, which is tacked down."

Consequently, the court instructed the jury with the Civil Code section 660 definition of "fixture": "Property affixed to land is a fixture. It is for you to determine which property, if any, is a fixture. A thing is deemed affixed to land when it is attached to it by roots, as in the case of trees, vines or shrubs; when it is [e]mbedded in it, as in the case of walls; or permanently resting upon it as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws."

On appeal, defendants rely on *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 884 (*Crocker*), which discussed the classification of fixtures for purposes of taxation. In *Crocker*, our Supreme Court held the test for a fixture is "whether a reasonable person would consider the item in question to be a

12

permanent part of the host real property, taking into account annexation, adaptation, and other objective manifestations of permanence." (*Ibid.*)

Crocker also discussed the test for fixtures for purposes of conveyances such as mortgages, where the question is, "did the conveyance transfer interest in the items or not?" (*Crocker*, *supra*, 49 Cal.3d at p. 886.) The crucial factor is whether the mortgagor had an "'apparent'" intent to make the item "'a permanent accession to the freehold.'" (*Ibid.*) This factor focuses on "the objective 'intent' that would be inferred by a reasonable grantee or mortgagee," *not* the subjective intent of the annexor. (*Ibid.*) "'[W]hat does the grantee or mortgagee, as a reasonable man, think he is receiving under the conveyance'"? (*Id.* at pp. 886-887.)

Defendants contend the court erred by instructing the jury with the Civil Code section 660 definition of "fixture," because that definition does not require the finder of fact to consider the objective manifestations of the intent of the party making the annexation. Defendants also contend the court's instruction created an impermissible conclusive presumption with the phrase, "A thing is deemed affixed to land . . . . ," again concluding that the instruction removed the issue of the annexing party's intent from the jury's consideration.

Contrary to defendants' contentions, Civil Code section 660 does exactly what defendants claim it does not do. The statute defines fixture in terms of the overarching objective manifestation of the annexing party's intent — namely, "permanence." (Civ. Code, § 660 [referring to fixtures "permanently" resting on the land or "permanently attached to what is thus permanent"].) As stated in *Crocker*, *supra*, 49 Cal.3d at page 884, classification of a fixture "should turn on whether a reasonable person would consider the item in question to be a *permanent* part of the host real property, taking into account annexation, adaptation, and *other* objective manifestations of *permanence*." (Italics added.) Thus, besides annexation and adaptation, there may be other objective manifestations of permanence presented by the evidence. But the

13

essential question for the jury is whether consideration of *all* of the evidence of permanence persuades beyond a reasonable doubt that the attachment was intended to be permanent.

Viewing the jury instructions in their entirety, the Civil Code section 660 instruction fits hand-in-glove with the element of a section 502.5 violation which requires that defendants have disposed of property "attached or affixed to [the] premises as an *improvement*" to the real property. (§ 502.5, italics added.) In common parlance, an improvement to real property is something that enhances the property's value or desirability. Additions to property lacking permanence normally will not affect value or desirability. Accordingly, instructing the jury with the definition of a "fixture" from Civil Code section 660 serves as a helpful adjunct to the instruction on section 502.5, and incorporates permanence as the objective manifestation of the annexing party's intent.

The court comprehensively instructed the jurors on the section 502.5 offense and their responsibility to ultimately determine which items were fixtures. The court also gave them a unanimity instruction requiring them to unanimously agree on which act(s) of theft of fixtures defendants committed.

Furthermore, although a defendant's subjective intent is irrelevant to the determination of which items are fixtures, it is an element of a section 502.5 offense. The court instructed the jury on the requirement that each defendant have acted with the specific intent to defraud or injure the trustee or beneficiary under the deed of trust. The court also instructed the jury on several defenses to, or factors weighing against, a finding that defendants intended to defraud or injure the trustee or the beneficiary — i.e., a defendant's returning or offering to return property, obtaining property under a claim of right, or ignorance or mistaken belief in a fact.

14

In sum, the court correctly instructed the jury on the section 502.5 offense and the related definition of fixtures from Civil Code section 660.

### 2. *The Court Properly Instructed the Jury on the Great Taking Enhancement*

Monique contends that the great taking enhancement under section 12022.6, subdivision (a)(1), applies only when a defendant *personally* takes, damages, or destroys property valued at over $65,000.[5] She argues the court improperly lowered the prosecution's burden to prove all elements of the section 12022.6, subdivision (a) enhancement, when the court instructed the jury that the enhancement applies if "the defendant either personally *or permitted another* to unlawfully take, remove or otherwise dispose of" property causing a loss greater than $65,000.[6] (Italics added.) By adding this

---

[5] Section 12022.6, subdivision (a)(1) provides: "When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] (1) If the loss exceeds sixty-five thousand dollars ($65,000), the court . . . shall impose an additional term of one year."

[6] The court instructed the jury with a modified version of CALCRIM No. 3220, as follows: "If you find a defendant guilty of the crime charged, you must then decide whether the People have proved the additional allegation that the value of the property (taken, damaged or destroyed) was more than $65,000. [¶] To prove this allegation, the People must prove that: 1. In the commission of the crime, the defendant (took, damaged or destroyed) property; 2. When the defendant acted, he or she intended to (take, damage or destroy) the property; [¶] AND [¶] 3. The loss caused by the defendant's (taking, damaging or destroying) the property was greater than $65,000. [¶] The value of property is the fair market value of the property. [¶] You must only consider the value of the fixtures which the defendant *either personally or permitted another to* unlawfully take, remove or otherwise dispose of as well as the value of any property damaged or destroyed in the commission of the taking, removal or disposal of those fixtures in determining the value of the property taken, damaged or destroyed. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

15

sentence, the court *modified* CALCRIM No. 3220, the standard jury instruction on the great taking enhancement, to encompass vicarious liability.  The court did not err in doing so.

In *People v. Fulton* (1984) 155 Cal.App.3d 91, 102 (*Fulton*), a different panel of this court held that the great taking enhancement imposes vicarious liability on an accomplice who does not personally take or destroy property of the requisite value.

The commentary to CALCRIM No. 3220 criticizes *Fulton*.  The Commentary states:  "Penal Code section 12022.6 applies to 'any person [who] takes, damages, or destroys any property . . . .'  The statute does not explicitly include vicarious liability but also does not use the term 'personally' to limit the scope of liability.  In [*Fulton*, *supra*,] 155 Cal.App.3d 91, 102 . . . , the Fourth Appellate District of the Court of Appeal interpreted this language to mean that the statute did not require that the defendant personally take, damage, or destroy the property, but provided for vicarious liability.  In reaching this conclusion, the court relied on the reasoning of *People v. Le* (1984) 154 Cal.App.3d 1 . . . , which held that an enhancement for being armed with a firearm under . . . section 12022.3[, subdivision (b)] allowed for vicarious liability despite the fact that the statute does not explicitly include vicarious liability.  The *Fulton* court . . . disagreed with the holding of *People v. Reed* (1982) 135 Cal.App.3d 149 . . . , which held that . . . section 12022.3[, subdivision (b)] did not include vicarious liability.  However, the *Fulton* decision failed to consider the Supreme Court opinion in *People v. Walker* (1976) 18 Cal.3d 232, 241–242 . . . , which held that an enhancement does not provide for vicarious liability unless the underlying statute contains an explicit statement that vicarious liability is included within the statute's scope.  Moreover, the Supreme Court has endorsed the *Reed* opinion and criticized the *Le* opinion, noting that *Le* also failed to consider the holding of *Walker*.  (*People v. Piper* (1986) 42 Cal.3d 471, 477, fn. 5 . . . .)  Similarly, the Fifth Appellate District of the Court of Appeal has observed that 'the weight of authority has endorsed the analysis in *Reed*' and rejected the holding of *Le*.

16

(*People v. Rener* (1994) 24 Cal.App.4th 258, 267 . . . [holding that . . . § 12022.3[, subds.] (a) & (b) does not include vicarious liability].)  Thus, although no case has explicitly overruled *Fulton*, the holding of that case appears to be contrary to the weight of authority."

True, in *Walker*, the California Supreme Court held that the gun use enhancement of former section 12022.5 required a finding that the defendant personally used the firearm, thereby precluding application of the enhancement to a defendant who had aided and abetted the underlying crime, but who had not personally used the gun.[7] (*Walker*, *supra,* 18 Cal.3d at pp. 235-236.)  To support that holding, the high court articulated the following rationale that can be interpreted to lay down a general rule applicable to most sentencing enhancements, not simply the firearm enhancement at issue in *Walker*:  "Generally, if a statute is intended to impose derivative liability on some person other than the actor, there must be some legislative direction that it is to be applied to persons who do not themselves commit the proscribed act.  Such a direction is found in section 31 which fixes responsibility on an aider and abettor for a crime personally committed by a confederate.  But the statute which defines aiders and abettors as principals in the commission of a criminal offense does not also purport to impose additional derivative punishment grounded on an accomplice's personal conduct, as those statutes which provide for such increased punishment '"do not define a crime or offense but relate to the penalty to be imposed under certain circumstances."'  [Citations.]  Hence the rules which make an accused derivatively liable for a crime which he does not

---

[7]        At the time of the *Walker* decision, former section 12022.5 provided in pertinent part:  "'Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, assault with intent to commit murder, rape, burglary, or kidnapping, upon conviction of such crime, shall'" receive an enhanced sentence. (*People v. Walker*, *supra*, 18 Cal.3d at p. 236, fn. 1 (*Walker*).)  The enhancement statute has since been substantially amended and restated and now requires *personal* use of a firearm, consistent with the holding in *Walker*. (§ 12022.5, subd. (a).)

personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime." (*Id*. at pp. 241-242.) *Walker* did not expressly consider the great taking enhancement.

A decade after *Fulton* and 18 years after *Walker*, the appellate court in *People v. Rener*, *supra*, 24 Cal.App.4th 258 reviewed the case law on the issue of vicarious liability for sentencing enhancements. (*Id*. at pp. 262-267.) The commentary to CALCRIM No. 3220 relied on *Rener* to conclude that *Fulton* "appears to be contrary to the weight of authority." But "'the weight of authority'" discussed in *Rener* consists of cases holding that *firearm and deadly weapon* enhancements and *infliction of great bodily injury enhancements* require personal, and not derivative, liability. The only case cited in *Rener* involving the great taking enhancement is *Fulton*.

But, for purposes of vicarious liability, a deadly weapon (or great bodily injury) enhancement is significantly different from the great taking enhancement. A weapon is typically held by only one person at a time. Similarly, the infliction of great bodily injury typically results from the application of force upon the victim by a single person. By definition, aiders and abettors do not personally inflict injury upon the victim; otherwise they would be classified as direct perpetrators.

In contrast, the great taking enhancement punishes for the perpetrator's taking or damaging of property in the commission of the underlying felony, *not* the endangerment of (or injury to) a human being. The clear purpose of the enhancement is to increase punishment when the defendant's crime has resulted in a large monetary loss to the victim. The enhancement does not address the *manner* by which the principals in the underlying felony committed the crime. This is especially true here, where the underlying criminal statute, i.e., section 502.5, expressly creates liability for a person who "*permits* the taking, removal or carrying away or otherwise disposing of" encumbered property with the requisite intent. (Italics added.)

18

In *Fulton*, Justice Crosby stated that failure to apply vicarious liability to the great taking enhancement "would lead to absurd results. The criminal who masterminds the offense would be subject to less severe punishment than the minions who actually carry out the crime at his direction." (*Fulton*, *supra*, 155 Cal.App.3d at p. 102.) The case at hand demonstrates this in concrete terms. Defendants — with the requisite intent, knowledge, and level of participation — orchestrated a crime that resulted in a loss to the lender of at least $166,000. Each of them should be held accountable for a great taking. It does not matter whether each *personally* took or damaged property valued at over $65,000. If the rule were otherwise, it would follow that whenever two or more persons jointly committed a theft of more than $65,000, but it could not be established which of the several defendants actually put the money in his or her pocket, no defendant would be subjected to the great taking enhancement. That would be an absurd result. "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)

Thus, we agree with *Fulton* that the great taking enhancement encompasses the liability of perpetrators who, either directly or as aiders and abettors, knowingly and voluntarily embark on a joint effort to take or dispose of property causing a loss of over $65,000. (*Fulton*, *supra*, 155 Cal.App.3d at p. 102 ["*all* persons who participate in an offense which results in a great taking, with the requisite knowledge and intent, are subject to the terms of the enhancement, regardless of the specific amount personally taken"].) For purposes of the great taking enhancement, it is the amount of the taking that is significant, not the manner of each person's participation in the offense.

19

We do not read *Walker* as establishing a blanket rule that applies to all sentencing enhancements.  Instead, *Walker's* general rule is limited to cases involving deadly weapon or great bodily injury enhancements.[8]

The court properly instructed the jury to consider only "the value of the fixtures which the defendant either personally or permitted another to unlawfully take, remove or otherwise dispose of . . . ."

*Defendants Should Be Ordered to Pay Probation Supervision Costs in a Separate Order, Rather Than as a Condition of Probation*

Monique contends that the court's order granting probation should be modified to delete as a probation condition the payment of probation supervision costs, and that defendants' payment of such fees should be ordered separately.  The Attorney General agrees that the orders granting probation to defendants should be modified as described above, and that defendants should be ordered to pay the costs of probation supervision as part of the judgment.

When a court grants probation to a defendant and the defendant does not waive the right to a determination of ability to pay, the court must order the defendant to pay reasonable probation costs if the court determines the defendant has the ability to pay them.  (§ 1203.1b, subds. (a), (b).)  The "reasonable costs of probation . . . are collateral

---

[8]    In a decision subsequent to *Walker*, our high court allowed the great taking enhancement to be imposed on a defendant who had not personally taken money obtained through welfare fraud, but had aided and abetted the crime.  (*People v. Crow* (1993) 6 Cal.4th 952, 960-963.)  *Crow* did not address whether it was proper to apply the great taking enhancement to a defendant who had aided and abetted the underlying felony, but instead considered only whether the evidence was sufficient to support the amount of the loss.  Accordingly, *Crow* is not direct authority for applying the great taking enhancement to an aider and abettor.  But the result in *Crow* does suggest that there are limits and exceptions to *Walker's* general statement that the rules allowing vicarious liability for crimes do not "impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime."  (*Walker*, *supra*, 18 Cal.3d at p. 242.)

20

and their payment cannot be made a condition of probation." (*Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 321.) Accordingly, we will "'modify the order granting probation to clarify that payment of those costs and fees is not a condition of probation but rather an order of the court entered at judgment.'" (*People v. Flores* (2008) 169 Cal.App.4th 568, 578.)

## DISPOSITION

We modify the trial court's probation order to eliminate any requirement that defendants pay the costs of probation as a condition of probation. We affirm, however, the imposition of those costs, and direct the trial court to enter a separate order directing defendants to pay such costs. In all other respects the judgment is affirmed.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.

21