Filed 11/13/25  P. v. Davis CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ISAIAH TYZHE DAVIS,<br><br>    Defendant and Appellant. | G064875<br><br>(Super. Ct. No. 20NF0691)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Lewis W. Clapp, Judge. Affirmed in part, reversed in part, and remanded.

        Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A.

Swenson and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

Isaiah Tyzhe Davis appeals from his convictions for stalking and attempting to make criminal threats against M.C. We conclude there was substantial evidence supporting these convictions, and there was no prejudicial error.

Davis also challenges his sentence on the ground it violates Penal Code[1] section 654. We agree that the course of criminal conduct in two of the counts was indivisible, and the trial court should have stayed execution of the sentence on one of them. We will remand the matter to the trial court to correct the sentence. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Davis and M.C. began dating in March 2018; he was 20 and she was 19. Their relationship soon became strained, as Davis was unfaithful, manipulative, jealous, and angry. He would have "tantrums" where he broke or threw items, especially when he was drinking. M.C. felt pressured to stay in the relationship due to Davis's threats of suicide or self-harm.

When M.C. tried to end the relationship in December 2018, Davis blackmailed her into staying with him by threatening to tell her parents she was drinking, partying, and smoking marijuana. In January 2019, during an argument, Davis became physically violent. Although M.C. wanted to end the relationship, she was afraid Davis would blackmail her.

In March 2019, M.C. broke up with Davis. Soon thereafter, M.C. learned that intimate photos of her had been posted on social media. Only she

---

[1] All further statutory references are to the Penal Code.

2

and Davis were in possession of these photos. M.C. obtained a temporary restraining order against Davis. When it expired six months later, she did not request an extension because she believed Davis "had learned his lesson and he would leave [her] alone."

In November 2019, Davis's mother contacted M.C. to say Davis was suicidal; she asked M.C. to speak with Davis. The couple resumed dating soon thereafter, but M.C. hid the relationship from her family. As before, the relationship continued although M.C. wanted to end it because Davis threatened to reveal private information to her parents and she felt "obligated to be there for him."

On the evening of March 5, 2020, Davis and M.C. got into an argument, and she told him she was ending the relationship. Davis threatened to beat up M.C.'s dad and kill her family by shooting them. M.C. was "angry and scared." Although she told Davis she did not believe him, she was actually concerned that he might follow through with his threats.

At about 3:00 a.m. on March 6, Davis began banging on the sliding glass door of M.C.'s family home and tried to enter the back door. M.C. and her parents were terrified and called the police. Davis left before the police arrived.

At about 11:00 p.m. that evening, M.C.'s father picked her up from work. As they were driving home, M.C. received a message from a coworker that Davis was at her workplace asking whether M.C. was there. Davis's car then appeared behind them driving aggressively. They ran into the house and M.C. called the police. As M.C.'s father locked a door in the back of the house, he saw Davis outside; Davis hit and kicked the door for several minutes, breaking parts of the door frame. During this incident, M.C.

was overwhelmed by fear and anxiety, and thought Davis was going to kill her and her parents. Davis was again gone before the police arrived.

Sometime before 2:00 p.m. on March 7, M.C. was alone in a music practice room at school. Davis appeared and blocked the door to the room. M.C. believed he was going to hurt her and complied with his demands out of fear. Davis said, "he ruined everything and that this was the end," and again threatened to kill himself. M.C. continued trying to deescalate the situation. When her parents arrived to pick her up, she walked outside with Davis, feeling she was in "survival mode." Her parents were with campus security. Her father saw that M.C. was pale, frightened, and nervous. He believed Davis wanted to harm their family. M.C. refused her parents' suggestion that they call the police because she did not want to escalate the situation. M.C.'s family later called Davis and asked him to leave them alone and not to hurt himself.

The next day, March 8, 2020, M.C. and her parents met in person with Davis at a restaurant before she went to work. M.C.'s parents told Davis if he left the family alone, they would not press charges against him. Davis continued to threaten to harm himself; he seemed "confused," "sad, tired, and very, very serious."

About 8:00 p.m. that evening, Davis showed up at the hotel where M.C. worked. M.C. told her supervisor, J.C., that she was taking a break to speak with Davis. M.C. tried to convince Davis to leave. She was anxious and scared and believed Davis would kill her and her family.

About 10 minutes later, J.C. also asked Davis to leave. Davis agreed to leave but said he would return for M.C. later. M.C. was back in survival mode; she continued to be afraid Davis would follow through on his threats against her and her family.

4

Davis returned to M.C.'s workplace at 10:20 p.m. M.C. refused multiple demands from Davis to leave with him. J.C. intervened, telling Davis, "She doesn't want to talk to you," and "I'm her supervisor, and so I'm saying that you have to leave." J.C. told Davis he would call the police and reached for the phone. Before he could finish making the call, Davis ordered him to put the phone down, told him to "shut the fuck up," and threatened to shoot and kill him. Davis lifted his shirt and gestured to his waistband, and J.C. thought he saw the black metal grip end of a gun. J.C. hung up the phone and tried to be friendly to Davis in the hope he would leave. J.C. was fearful that Davis would shoot him.

M.C. tried to defuse the situation by talking to Davis. She believed she needed to leave with Davis to protect J.C. and prevent the situation from getting worse. M.C. was terrified and overwhelmed and was afraid Davis would shoot her or J.C. After hanging around the hotel lobby for about an hour, Davis told M.C. he would drag her out if she refused to leave with him. M.C. was afraid he was going to take her somewhere and assault or kill her. She was scared and angry as he grabbed her arm while leaving the lobby. Immediately after Davis and M.C. left, J.C. called the police.

As Davis and M.C. were leaving the hotel, her parents arrived to pick her up. Davis said he wanted to take M.C. with him, but her father refused, seeing that she was shaking. M.C.'s father suggested they meet at a nearby restaurant to continue talking. During their ride to the restaurant, M.C. told her parents what had happened at the hotel; her father became very worried and fearful for his family's safety. Police officers were in the parking lot of the restaurant when they arrived. M.C. and her family hid inside the restaurant while Davis remained in the parking lot.

The police searched Davis's car and found two pellet guns; these guns looked to the police like genuine firearms and did not have orange tips (which would signify they were not real firearms). The police also spoke with M.C., who appeared afraid and was "visibly bothered by the events that had transpired." M.C.'s mother and father also appeared to the police to be afraid.

The District Attorney charged Davis in an information with stalking (§ 646.9, subd. (a); count 1); making criminal threats (§ 422, subd. (a); count 2 against M.C., and count 4 against J.C.); dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 3); and brandishing an imitation firearm (§ 417.4; count 5). The information also alleged Davis committed the offenses while he was released from custody on bail on a primary felony, under section 12022.1, subdivision (b).

At trial, Davis did not testify in his own defense. His mother testified Davis was depressed and had struggled with deaths in their family during the time in question. Davis had also suffered physical injuries while training with the Marines.

As to count 2, the jury acquitted Davis of making a criminal threat against M.C. but convicted him of attempting to make a criminal threat, a lesser included offense. The jury convicted Davis on all other counts. In a bifurcated proceeding, the trial court found true the on-bail sentencing enhancement allegation.

The trial court sentenced Davis to a total of two years in state prison: the midterm of two years on count 1, with concurrent terms on counts 2, 3, and 4. The court stayed imposition of sentence on count 5 and struck the on-bail enhancement.

Davis filed a timely notice of appeal.

6

DISCUSSION

I.

SUFFICIENCY OF THE EVIDENCE FOR STALKING

Davis contends there was insufficient evidence to support the guilty verdict on count 1 for stalking.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence of the defendant's guilt. (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) Although the evidence must be reasonable, credible, and of solid value, we do not reweigh the evidence or reevaluate the credibility of the witnesses who testified at trial; rather, "'[w]e presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the [trier of fact's] findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding."'" (*Ibid.*) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

A conviction for stalking requires proof that the defendant (1) intentionally and willfully (2) harassed or repeatedly followed the victim and (3) made a credible threat (4) with the intent to place the victim in reasonable fear for their own or their family's safety. (§ 646.9; CALCRIM No. 1301.) On appeal, Davis challenges the sufficiency of the evidence of M.C.'s reasonable fear. Davis points to M.C.'s "voluntary contact" with Davis during the three-day period in March. M.C. testified about multiple contacts

7

with Davis during that time that were not voluntary, including Davis's aggressive driving behind M.C. and her father; two separate occasions on which Davis pounded on and kicked the door of M.C.'s family home; Davis's uninvited appearance at M.C.'s music practice where he physically blocked her exit; and his multiple uninvited appearances at her workplace. M.C. explained that every time she had voluntary contact with Davis, it was for the purpose of deescalating his threatening conduct, and she testified she was afraid that Davis would kill her or her family if she did not appease him. Finally, numerous other witnesses testified to M.C.'s fear.

In *People v. Carvalho* (1952) 112 Cal.App.2d 482, 483, on which Davis relies, the defendant was convicted of kidnapping his estranged wife while armed. The appellate court reversed the conviction because the victim's testimony was "fantastic." (*Id.* at p. 489.) The court noted that the victim had multiple opportunities to escape from the defendant during the roughly 11 hours the incident lasted, she cooked for him, helped him bathe, and had sex with him during that time, and she failed to report the incident for a month. (*Id.* at p. 490.) Whether the appellate court was correct in discounting the victim's testimony,[2] the case is not on point. M.C. did not wait a month before contacting the police regarding Davis's stalking and threatening behavior. She and other members of her family called the police multiple times during the key March period. She did not take any actions toward Davis such as engaging in sexual relations or bathing him or cooking for him. Every time she engaged with Davis it was for the purpose of deescalating the

---

[2] The Attorney General notes that the case is almost 75 years old, and it reflects an outdated view of spousal abuse. While we agree, the case is otherwise distinguishable, so we need not analyze whether its holding must be discounted as anachronistic.

situation, preventing him from hurting himself, her, or her family, or attempting to talk him into leaving her and her family alone.

## II.

### INSTRUCTION ON ATTEMPTED CRIMINAL THREATS

Davis argues, and the Attorney General concedes, the trial court erred by failing to properly instruct the jury with respect to the lesser included offense of attempting to make a criminal threat in count 2. Therefore, our analysis will be limited to whether the error was prejudicial.

The trial court correctly instructed the jury with CALCRIM No. 1300 regarding the elements of the crime of making a criminal threat. The court also instructed the jury regarding the lesser included offense of attempting to make a criminal threat with CALCRIM No. 460, the general instruction regarding attempts. In relevant part, this instruction provides: "To prove that the defendant is guilty, the People must prove that: [¶] 1. The defendant took a direct but ineffective step toward making a criminal threat; [¶] AND [¶] 2. The defendant intended to make a criminal threat. [¶] . . . [¶] To decide whether the defendant intended to make a criminal threat, please refer to the separate instructions that I have given you on that crime."

However, the crime of attempting to make a criminal threat includes an element that is not present in the crime of making a criminal threat: "that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*People v. Chandler* (2014) 60 Cal.4th 508, 525 (*Chandler*); see use notes for CALCRIM No. 460.)

In *Chandler*, the California Supreme Court held that, in order to avoid criminalizing free speech, an objective element must be read into the elements of attempting to make a criminal threat. (*Chandler, supra*, 60 Cal.4th at p. 525.) While the Supreme Court concluded the trial court in

9

that case had erred by failing to include an objective element in its instructions, it further concluded there was no prejudice to the defendant because "defendant's threats were sufficient under the circumstances to cause a reasonable person to be in sustained fear—indeed, defendant did not argue otherwise at trial—and no reasonable juror could have concluded otherwise." (*Id.* at pp. 525–526.) In that case, the defendant, a neighbor of the victims, made explicit, face-to-face threats to kill the victims while holding a golf club. (*Id.* at p. 526.)

The Supreme Court distinguished *People v. Jackson* (2009) 178 Cal.App.4th 590, on which Davis relies, on the ground the facts in *Jackson* did not support a finding of an objective, sustained fear by the victims. (*Chandler, supra*, 60 Cal.4th at p. 526.) In *Jackson*, the Court of Appeal reversed the defendant's conviction for attempting to make a criminal threat because "the jury might have concluded, since [the victims] were safely inside the house with a telephone to call the police while defendant sat out front, or since defendant's threats were so outlandish, that defendant's statements could not reasonably have caused the victims to suffer sustained fear." (*Jackson, supra*, at p. 600.)

Here, Davis's threats to M.C. and her family were "sufficient under the circumstances to cause a reasonable person to be in sustained fear . . . and no reasonable juror could have concluded otherwise." (*Chandler, supra*, 60 Cal.4th at p. 526.) Since the beginning of their relationship, Davis had been aggressive, angry, and pressured M.C. to stay in the relationship through threats of suicide, self-harm, and blackmail. When M.C. did break up with Davis for a period of time, he posted (or allowed someone else to post) intimate photos of her online.

After M.C. told Davis she wanted to break up in March 2020, his actions would "cause a reasonable person to be in sustained fear." (*Chandler, supra*, 60 Cal.4th at p. 525.) For example, he threatened to shoot her family and beat up her dad. Then Davis appeared at her family's home in the middle of the night, banging on and trying to enter through the back door. Late in the evening of that day, Davis drove his vehicle aggressively behind the car in which M.C. was riding with her father. M.C. and her father ran into their house and locked the doors. Davis again banged on and kicked the door in the back of the house, breaking parts of the frame.

The next day, Davis blocked M.C. from leaving a practice room at school, threatening to kill himself. Throughout this period, M.C. feared for her own life and the lives of her family members and continually tried to deescalate the situation when Davis's behavior escalated.

The following day, Davis showed up at M.C.'s place of employment twice, and threatened to kill M.C.'s supervisor. M.C. believed she needed to placate Davis to prevent him from shooting her or her supervisor. Davis demanded M.C. leave with him, threatened to drag her out, and grabbed her arm as she left with him.

Given Davis's history of threats, violence, and appearing at M.C.'s home, school, and place of employment uninvited, a reasonable person would have been in sustained fear based on Davis's actions and statements, and no reasonable juror could have found otherwise. Therefore, Davis suffered no prejudice from the trial court's instructional error.

### III.

### UNANIMITY INSTRUCTION

The trial court instructed the jury with CALCRIM No. 3500, as follows: "The defendant is charged with violations of [Penal Code section] 422

11

Criminal Threats in Counts 2 & 4 sometime during the period of March 5, 2020 to March 8, 2020. [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." Davis argues a juror could have understood the unanimity instruction to mean that if all 12 jurors unanimously agreed as to count 4 that Davis threatened to kill J.C., then the jury could convict Davis on count 2 of threatening M.C. if only 7 out of 12 jurors believed he had done so, thereby violating his constitutional right to be convicted by a unanimous jury.[3]

The Attorney General contends Davis forfeited this argument by failing to object to the language of the instruction in the trial court. Because the court instructed the jury with the appropriate CALCRIM instruction, Davis was required to make a timely objection or request the court modify or clarify the instruction, which he did not do. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Therefore, any argument was forfeited. However, to forestall the inevitable claim of ineffective assistance of counsel, we will address the issue on its merits. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146.)

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable

---

[3] Davis does not argue the court erred by failing to instruct the jury it must unanimously agree on which of the threats made to M.C. constituted the attempt to make a criminal threat in count 2.

likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) Jurors are presumed to understand and follow the instructions. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148; *People v. Holt* (1977) 15 Cal.4th 619, 662.)

During closing arguments, the prosecutor referenced threats made to M.C. on March 5 ("I'm going to kill you and your family"; "I'm going to shoot you"; "I am going to beat up your dad") and on March 8 ("I am going to drag your ass to the car").

The court correctly instructed the jury with the elements of the crime of making a criminal threat using CALCRIM No. 1300. (See § 422.) The court also instructed the jury with CALCRIM No. 3515: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one."

In light of the entirety of the instructions, we do not believe it is reasonably possible any juror could have understood the unanimity instruction to mean that, if the jury unanimously agreed that Davis threatened J.C., then it could convict Davis of threatening M.C. without a unanimous verdict. "We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions." (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119.)

IV.

THE SENTENCE ON EITHER COUNT 3 OR COUNT 4 MUST BE STAYED PURSUANT TO SECTION 654

Davis argues, and the Attorney General agrees, that the trial court must stay the execution of sentence on either count 3 or count 4, because the course of criminal conduct in those two counts was indivisible.

13

When a defendant's single course of conduct violates two criminal statutes, the defendant may be convicted of both crimes, but may only be sentenced on one. (§ 654; *People v. Jones* (2012) 54 Cal.4th 350, 358–359.) Here, Davis's threat to kill J.C. while he was trying to call the police was both an act dissuading a witness by force or threat (count 3) and a criminal threat (count 4).

On remand, the trial court shall stay the sentence on either count 3 or count 4.

## DISPOSITION

The judgment is affirmed in part, reversed in part, and remanded for resentencing. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


BANCROFT, J.*

WE CONCUR:


SANCHEZ, ACTING P. J.


GOODING, J.


* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14